IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br><br>MARVIN BUTLER,<br><br>              Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**<br><br><br>Case No. 2:15-CR-465-DB<br><br>District Judge Dee Benson |

Before the Court is Defendant Marvin Butler's ("Butler" or "Defendant") Motion to Suppress.  (Dkt. No. 28.)  On December 8, 2015, the Court heard oral argument on Butler's Motion.  Steven Killpack represented Butler.  Lake Dishman and Jared Bennett represented the United States.  At the conclusion of oral argument, the Court determined that the facts and circumstances of the case required an evidentiary hearing, as requested by Butler, and a site visit. The purpose of the site visit was to provide the Court with an understanding of the layout of the property where the alleged illegal search occurred.

On December 18, 2015, the Court, with the permission of Butler, visited the site of the alleged illegal search.  During the site visit, Butler's counsel, Steven Killpack was present. Additionally, Special Agents Jude Densley and James Mercier of the Environmental Protection Agency were present.  Butler, through counsel, waived any right to be present during the site visit.  Counsel for the government also waived their right to be present during the site visit.

On January 20, 2016, the Court conducted an evidentiary hearing on Butler's Motion. Butler was present and represented by Steven Killpack.  Jared Bennett represented the United States.  Following the evidentiary hearing, the Court heard oral argument on the motion.  At the

conclusion of oral argument, the Court ordered a transcript and set a briefing schedule.[1]  After

thorough review and consideration of the memoranda submitted by the parties, the testimony and

evidence presented at the evidentiary hearing, and the oral argument presented by counsel, the

Court renders the following Memorandum Decision and Order.

## FINDINGS OF FACT

The Court finds the facts as follows.[2]  The alleged illegal search in this case involved the

issuance of two search warrants to search the property known as 1819 South Main Street,

Spanish Fork, Utah.  1819 South Main Street is occupied by a business, Almost Home

Enterprises ("Almost Home").  Almost Home is in the portable toilet business and is operated by

Margie Butler and the Defendant.  (Gov. Ex. 1[3], p. 3, ¶ 12.)  Additionally, Butler maintains a

residence in the lower level of the building located at 1819 South Main Street.  Almost Home

and Butler's residence are located adjacent to the Spanish Fork River.

## I.  The EPA Warrant

In 2014, law enforcement received reports concerning potential Clean Water Act

violations by Almost Home.  (*See id.* at p. 3.)  Investigators received information that led them to

believe Almost Home was dumping raw sewage into the Spanish Fork River.  Specifically,

witnesses had observed Butler dumping septic waste into the river.  (*Id.* at p. 5, ¶ 21.)  Witnesses

also observed piping or hoses leading from the business to the river, discolorations of the river,

and debris such as toilet paper along the bank and downstream from the business.  (*Id.* at p. 3–5,

---

[1]  The Court asked the parties to brief the narrow issue of whether officers could conduct a protective sweep of Butler's residence assuming officers did not have permission to be in Butler's residence by way of the EPA warrant. The period for additional briefing ended on February 15, 2016.

[2] Reference to the transcript of the evidentiary hearing conducted on January 20, 2016 will be cited as "Tr. at __."

[3] Government Exhibit 1 is the July 30, 2015 Search and Seizure Warrant/Affidavit of Special Agent Jude Densley of the EPA.

¶¶ 13, 21–23.)  Furthermore, the Provo Water Reclamation Facility informed investigators that Almost Home had slowed its normal permitted discharges to the facility.  (*Id.* at p. 4, ¶ 20.)

Relying on this evidence, Special Agent Jude Densley ("Agent Densley") of the Environmental Protection Agency ("EPA") drafted a search warrant and affidavit that sought to search Almost Home's business premises for violations of the Clean Water Act (the "EPA warrant").  The EPA warrant application's description of the property to be searched was as follows:

> The premises to be searched is 1819 South Main Street, Spanish Fork, Utah 84660 and a 2002 Dodge 3500 truck with a vehicle identification number of 3B6MF36662M218672, which may bear a Utah license plate of 733 PMP, including the surrounding grounds, any outbuildings, garages, sheds, storage containers, tanks, portable toilets, trash containers, pumps, pipes, hoses, tubing or other conveyance located thereon. The property is more particularly described as a tan colored square or rectangular building with a flat roof facing west with a brown colored roll-up garage door south of a brown colored man door. The property is adjacent to the Spanish Fork River, which is located along the east side of the property. The business is also distinguishable from other businesses on Main Street since there are blue and brown portable toilets stored in the front and back of the business.

(*Id.* at Att. A.)  The warrant's description of the property to be seized included items that would provide the EPA with evidence of violations the Clean Water Act.  For example, the items to be seized included "pumps, drains, tanks, pipes, hoses, tubing, conveyances, equipment or drainage system used or capable of being used for discharging a pollutant into water."  (*Id.* at Att. B, ¶ 1.) The warrant sought to obtain water, soil, and plant samples from the property.  (*Id.* at Att. B, ¶ 2.)  Additionally, the warrant sought "[r]ecords, files, manifests or other documents related to the collection, accumulation, storage, analysis, handling, treatment or disposal of domestic septage, sewage, sludge, or other waste by or for Almost Home Enterprises."  (*Id.* at Att. B, ¶¶ 3–5.)

On July 30, 2015, United States Magistrate Judge Evelyn Furse approved the EPA warrant.

**II. Layout of 1819 South Main Street, Butler's Residence, and the EPA Warrant**

Relevant to Defendant's Motion is the layout and use of Almost Home.  The building located on 1819 South Main Street has two levels.  (Gov't Exhibits 3.a, 3.b.[4])  The upper level consists of a garage, three storage rooms, and an office.  (*Id.*)  The lower level contains a storage common area and a residence occupied by Butler.  (*Id.*)  Butler's residence consists of a three bedroom apartment, including a kitchen area, two bathrooms, and a bedroom.  (*Id.*)  The diagrams below reflect the layout of the building located on the property.



Upper Level[5]                    Lower Level

---

[4] Government Exhibit 3.a and 3.b are illustrative drawings of 1819 South Main Street, Spanish Fork, Utah.

[5] The diagrams are digital recreations of Gov't Exhibits 3.a and 3.b for illustrative purposes.

Agent Densley enlisted the help of the Spanish Fork Police Department to execute the EPA warrant.  Detective Zachary Robinson ("Detective Robinson") of the Spanish Fork Police Department led the team of officers aiding the EPA.  (Tr. at 80:3–7.)  Detective Robinson testified that the police officers executing the warrant were not there to search; rather, the officers were present to secure the property so that the EPA could perform their duties.  (Tr. at 89:3–13: 89:17–18.)  Detective Robinson also testified that the he and his fellow officers were not trained to search for the type of evidence the EPA was looking for.  (*Id.*)

Agent Densley and Detective Robinson knew that Butler maintained a residence in the lower level of the building and that Butler was likely to be present in the residence during the execution of the warrant.  (Tr. at 12:23; 13:1–3; 39:12–13; 44:13–15; 53:5; 59:3–5; 81:3–7.)  Detective Robinson had been to the property on a prior occasion on an unrelated matter.  (Tr. at 58:7–11; 78:8–16.)  Detective Robinson knew Butler lived in the lower level of the building and that officers were likely to encounter Butler when executing the warrant.  (Tr. at 78:8–16; 79:6–25; 81:2–7.)  Detective Robinson was also aware that Butler had prior felony convictions.  (Tr. at 74:12–13.)

Agent Densley was informed of Butler's residence on the property before she applied for the EPA warrant.  (Tr. at 39:9–13 ("Q. Are you saying then today that at the time that you sought the search warrant you knew there was a residence in the basement of the premises? A. I knew that there were living quarters or an apartment in the lower level, in the basement, yes.").)

The EPA warrant was devoid of any meaningful reference to Butler's residence on the property.  Agent Densley's description of the property to be searched did not disclose Butler's residence.  (*See* Gov't Ex. 1, Att. A.)  Agent Densley's search warrant affidavit contained a singular passing reference to Butler's residence.  (Gov't Ex. 1, p. 6, ¶ 26 (stating, "According to

records from the Spanish Fork Police Department, Marvin Butler called the police department on June 25, 2015, reporting water in the creek behind his residence was red and he was concerned").)

Additionally, the EPA warrant did not provide any information tying violations of the Clean Water Act to Butler's residence. The focus of the EPA warrant was the business, Almost Home, and Almost Home's alleged illegal dumping into the Spanish Fork River. (*See generally id.*) The EPA warrant did not describe what violation of the Clean Water Act the EPA expected to discover in Butler's residence. (*Id.*)

### III. Execution of the EPA Warrant

On August 4, 2015, the EPA warrant was executed. At around 7:50 a.m., approximately ten Spanish Fork police officers wearing tactical gear, brandishing handguns and assault rifles, entered Butler's residence. (Tr. at 17:25; 61:24; 77:13–21; Gov't Ex. 14 at 7:00:49.[6]) Officers knocked three times and after a few seconds with no response, the officers announced their presence and entered the residence. (*See* Gov't Ex. 14 at 7:00–01; Tr. at 63:5–6.) For officer safety, Butler and his girlfriend Sharlene Vert ("Vert") were removed from the bedroom into the kitchen area and handcuffed. (Gov't Ex. 14 at 7:01–2; Tr. at 64:17–20.) During the initial sweep of the lower level, officers observed two gun safes in the "shop area." (Gov't Ex. 14 at 7:35 (discussing the location of the gun safes with Butler).)

Subsequently, Detective Robinson conducted a "secondary" protective sweep of the bedroom and then entered the kitchen to speak with Butler and Vert. (Gov't Ex. 14 at 7:02:00; Tr. at 64:23.) After briefly speaking with Butler and Vert, Detective Robinson reentered the bedroom for the third time on Vert's instructions looking for Vert's glasses and a pair of pants

---

[6] Government Exhibit 14 is a recording from Spanish Fork Police Department Detective Zachary Robinson's body camera in operation during the time of the initial search.

for Butler.  (Gov't Ex. 14 at 7:03:12; Tr. at 65:2–9.)  During Detective Robinson's activities,

other officers continued to look around the bedroom.  (*See* Gov't Ex. 14 at 7:02–04.)

After unsuccessfully looking for Vert's glasses and clothing for Butler, Detective

Robinson left the kitchen to check on his fellow officers at which point he discovered .22 rifle

ammunition on a shelf next to the entry point in the "shop area" of the building.  (*See id.* at 7:13–

15; Tr. at 65:14–20.)  After viewing the ammunition, Detective Robinson Mirandized Butler and

questioned Butler about weapons on the property for officer safety.  (Gov't Ex. 14 at 7:13–15;

Tr. at 66:13–25.)  Butler informed Detective Robinson that there was a .22 rifle behind the door

that led to the entrance to the kitchen.  (Gov't Ex. 14 at 7:13–15; Tr. at 66:23–25.)  Detective

Robinson located the .22 rifle behind the open door to the kitchen.  (Gov't Ex. 4.L.[7])

After discovering the .22, at Detective Robinson's instruction, Butler and Vert were un-

cuffed.  (Tr. at 84:9–17.)  Detective Robinson ordered Butler and Vert un-cuffed despite a

warning from his fellow officer that Butler was in close proximity to a set of knives in the

kitchen.  (Gov't Ex. 14 at 7:18:05.)  After Butler and Vert were un-cuffed, Agent Densley

entered the kitchen to speak to Butler about the EPA warrant.  (*Id.* at 7:18:45.)

While Agent Densley was speaking to Butler, Detective Robinson entered the bedroom

for a fourth time to continue searching for evidence.  (*Id.* at 7:21.)  Detective Robinson testified

that his fourth entry into the bedroom was to look for weapons for officer safety.  (Tr. at 68:20–

25.)  The Court is not persuaded.  Detective Robinson felt safe enough to un-cuff Butler and Vert

before Detective Robinson reentered the bedroom—despite Butler's close proximity to several

knives.  Furthermore, Detective Robinson and other responding officers had been in and out of

---

[7] Government Exhibits 4.a–4.x are photographs of the exterior and interior of 1819 South Main
Street, Spanish Fork, Utah, taken during the execution of the EPA warrant.

the bedroom several times prior to Detective Robinson's fourth entry.  The Court finds Detective Robinson's blanket statement of officer safety to lack credibility and corroboration.

During Detective Robinson's fourth entry into the bedroom, Detective Robinson noticed a small smoking pipe on a desk in the bedroom.  (Tr. at 69:14–17.)  Based on his training and experience, Detective Robinson concluded that the pipe contained marijuana.  (Tr. at 69:23–25.)

After observing the marijuana pipe, Detective Robinson exited the bedroom and told a fellow officer that he had "just seen" a marijuana pipe and was going to obtain a second warrant to search the property for drugs.  (Tr. at 70:15–17; Gov't Ex. 14 at 7:23.)

Before seeking the second warrant, Detective Robinson brought Vert into the bedroom, gave Vert Miranda warnings, and then proceeded to question her about potential drug use.  (Gov't Ex. 14 at 7:28–29.)  Vert indicated that she and Butler had smoked marijuana and methamphetamine.  (*Id.* at 7:31.)

While questioning Vert, Detective Robinson noticed a jar filled with a green leafy substance on top of the bedroom dresser, which, based on his training and experience, he recognized to be marijuana.  (Tr. at 71:21–22.)  Additionally, Vert indicated that there was methamphetamine and marijuana in one of the dresser drawers.  (Gov't Ex. 14 at 7:31.)  Based on Vert's indication, Detective Robinson observed through a partially open dresser drawer a digital scale, small bags, a bag with a white crystal substance that Detective Robinson recognized as methamphetamine, glass methamphetamine pipes, and a bag with a green leafy substance which Detective Robinson recognized to be marijuana.  (Tr. at 71:23–25; 72: 9–15.)

**IV. The Second Warrant**

Based on Detective Robinson's findings, Special Agent Jacob Moore of the Bureau of Alcohol, Tobacco, Firearms and Explosives applied for a second warrant to search the property

for weapons and drugs.  (Dkt. 28-3, Att. B.)  To support his statement of probable cause, Agent

Moore relied on the following evidence: (1) Butler's prior felony convictions and Butler's

relationship to the residence; (2) the marijuana pipe found by Detective Robinson on his fourth

entry into the bedroom; (3) Butler's post-Miranda statements regarding the location of the .22

rifle; (4) the .22 rifle ammunition found near the entrance of the lower level; (5) the .22 located

near the entrance to the residence; (6) the gun safes observed by officers in the "shop area" of the

building; (7) Vert's post-Miranda statements regarding methamphetamine and marijuana use;

and (8) Detective Robinson's observation of a digital scale, plastic bags, a bag containing white

crystal substance consistent with methamphetamine, glass methamphetamine pipes, and a bag

containing marijuana in the open bedroom dresser drawer.  (*Id.* at p. 2–3, ¶¶ 6–13.)  On August

4, 2015, Magistrate Judge Furse approved the second warrant and the property was searched for

drugs and weapons in conjunction with the EPA warrant.

## STANDARDS OF REVIEW

"The defendant bears the burden of proving that the challenged search was illegal under

the Fourth Amendment, but the ultimate determination of reasonableness under the Fourth

Amendment is a question of law."  *United States v. Castellon*, 189 F.3d 479 (10th Cir. 1999)

(unpublished).  Further, the defendant bears the burden of demonstrating a "'factual nexus

between the illegality and the challenged evidence.'"  *United States v. Nava-Ramirez*, 210 F.3d

1128, 1131 (10th Cir. 2000) (citations omitted).  If the facts demonstrate that a warrantless

search has occurred, the "government bears the burden of proving the reasonableness of a search

or seizure."  *United States v. Kitchell*, 653 F.3d 1206, 1217 (10th Cir. 2011) (citation omitted).

Additionally, the Court is mindful that the "credibility of witnesses, the weight accorded to

evidence, and the reasonable inferences drawn therefrom fall within the province of the district court."  *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (citations omitted).

## DISCUSSION

The Fourth Amendment to the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, . . . particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment's "prohibition on unreasonable searches and seizures is enforced through the exclusionary rule, which excludes evidence seized in violation of the Fourth Amendment."  *United States v. Guzman-Cruz*, 2:14-cr-61, 2015 WL 150286, at *8 (D. Utah Jan. 12, 2015).

Butler's Motion relies on the exclusionary rule.  Specifically, Butler argues that the evidence in this case should be suppressed because the EPA warrant failed to disclose Butler's residence on the property.  (Dkt. 28, p. 2.)  Therefore, Butler contends that officers had no legal basis for entering and searching the residential area of the property and any evidence found therein must be suppressed.  (*Id.*)  Additionally, Butler argues that the second warrant obtained was based solely on evidence obtained from the illegal search of the residence and any evidence found during the execution of the second warrant is excludable under the fruit of the poisonous tree doctrine.  (*Id.*)  Each of the Defendant's arguments will be discussed in turn.

## I. The Government's Authority to Search Butler's Residence Pursuant to the EPA Warrant

"The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home . . . ."  *Wilson v. Layne*, 526 U.S. 603, 610 (1999); *Payton v. New York*, 445 U.S. 573, 601 (1980) (emphasizing "the overriding respect for the sanctity of the home that has been

embedded in our traditions since the origins of the Republic"). Whether the home is a mansion on a hill or a home within a business, the Fourth Amendment affords the home protection from unreasonable government intrusion. Indeed, "absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Groh v. Ramirez*, 540 U.S. 551, 564 (2004).

In this case, the Court finds the EPA warrant did not authorize the search of Butler's residence. The EPA warrant failed to meaningfully disclose and seek permission to search Butler's residence. Moreover, the EPA warrant did not authorize officers to search for evidence of violations of the Clean Water Act in Butler's bedroom. Additionally, the Court finds that the government is not saved by the good faith exception to the warrant requirement. The government has failed to demonstrate that officers had an objectively reasonable good faith basis for searching Butler's residence.

## A. The Particularity Requirement

The EPA warrant failed to disclose and particularly describe Butler's residence. The Fourth Amendment requires the affiant to particularly describe the "place to be searched." U.S. Const. amend. IV. The "manifest purpose" of the particularity requirement is to "ensure[] that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971) (noting that the purpose of the particularity requirement is to address the "specific evil" of the "'general warrant' abhorred by the colonists" (citations omitted)). Indeed, "a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n. 5 (1984).

"'The test for determining the adequacy of the description of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premise might be mistakenly searched.'" *Harman v. Pollock*, 446 F.3d 1069, 1078 (10th Cir. 2006) (citations omitted). The "'requisite specificity of the description . . . depends heavily on the facts of each case.'" *Id.* at 1078–79 (quoting *United States v. Dorrough*, 927 F.2d 498, 500 (10th Cir. 1991)). Importantly, the validity of a warrant "must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." *Id.* at 1079 (quoting *Garrison*, 480 U.S. at 85).

This is not a case where law enforcement encountered a residence unexpectedly during an execution of a warrant. *See, e.g.*, *Garrison*, 480 U.S at 87; *Harman*, 446 F.3d at 1085. Agent Densley and Detective Robinson had knowledge that Butler maintained a residence in the lower level of the building. Therefore, the Court must examine what the particularity requirement demands when law enforcement seeks to search a known residence.

The Court finds the Tenth Circuit's opinion in *United States v. Dahlman*, 13 F.3d 1391 (10th Cir. 1993) to be instructive as to what level of particularity is demanded when officers are aware of a residence on the property to be searched. In *Dahlman*, police officers obtained a warrant to search several subdivision lots. *Id.* at 1394. The warrant described the property to be searched as "Tee Pee Ranch Phase II, Type II Subdivision, Catron County, New Mexico, Lots 128 and 129. Lots 128 and 129 are located at the intersection of Wilderness Lane and Lance Lane." *Id.* When officers executed the warrant, officers searched a camping trailer and a cabin on the property where the defendant was residing. *Id.* The warrant made "[n]o mention . . . of any residence or other structures to be searched." *Id.* at 1395. Subsequently, the defendant

challenged the admissibility of the guns discovered in the cabin on the grounds that the warrant

failed the particularity requirement.  In finding the warrant failed the particularity requirement,

the court noted:

> [G]iven our well-founded tradition of recognizing the sanctity of the home, a
> warrant authorizing the search of a lot of land without a more precise definition of
> the scope of the search is inconsistent with the particularity requirement of the
> Fourth Amendment, and does not suffice to authorize a search of a residence
> located on the land.

*Id.* at 1395.[8]  The court held that "where officers intend to search a residence, the description of

the property to be searched may not be so ambiguous as to leave doubt as to the scope of the

search."  *Id.* at 1396.  Moreover, the court held the particularity requirement requires "officers to

be more particular in their description when they wish to search a *known residence*." *Id.*

(emphasis added).

Like *Dahlman*, if the EPA wanted to search Butler's residence, the particularity

requirement demands that the EPA sufficiently disclose Butler's residence to the issuing

magistrate.  That they did not do.  The EPA warrant's description of the property to be searched

did not include any reference to Butler's residence known by officers to be located on the

property.  Agent Densley's affidavit contained one passing reference to Butler's residence in the

statement of probable cause.  (Gov't Ex. 1, p. 6, ¶ 26 (stating, "According to records from the

Spanish Fork Police Department, Marvin Butler called the police department on June 25, 2015,

reporting water in the creek behind his residence was red and he was concerned").)  However,

the Court is not persuaded that a singular passing reference to Butler's residence in a lengthy

twelve page warrant application is sufficient to cure the EPA warrant's lack of particularity or

sufficient to place Magistrate Judge Furse on notice of the EPA's intent to search a residence.

---

[8] The Court also held that the warrant was not saved by the more detailed affidavit because
officers failed to attach the affidavit to the warrant and the warrant failed to reference the affidavit.
*Dahlman*, 13 F.3d at 1395.

*Dahlman*, 13 F.3d at 1395 (noting that a particularized affidavit may cure an overly broad warrant). Therefore, the EPA warrant fails to meet the particularity requirement of the Fourth Amendment.

Additionally, assuming *arguendo*, a single inconsequential reference to a residence is enough to place a magistrate judge on notice of the intent to search a residence; the EPA warrant still failed to provide officers with a legal basis to search Butler's residence. The EPA warrant did not authorize officers to search Butler's residence for violations of the Clean Water Act.

### B. The Nexus Requirement

The EPA warrant wholly lacked any nexus between Butler's residence and potential violations of the Clean Water Act. "'An affidavit establishes probable cause for a search warrant if the totality of the information it contains establishes the fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Barajas*, 710 F.3d 1102, 1108 (10th Cir. 2013) (citations omitted). Importantly, "[p]robable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity." *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998).

In this case, the Court does not disagree that Magistrate Judge Furse had an adequate basis to find probable cause to search Almost Home for violations of the Clean Water Act.[9] However, the Court finds that nothing on the face of the warrant provided officers with a legal basis for entering Butler's residence to search for violations of the Clean Water Act. Magistrate

---

[9] The Court recognizes that the nexus requirement potentially implicates Magistrate Judge Furse's finding of probable cause and that Magistrate Judge Furse's determination of probable cause is entitled to deference. *United States v. Biglow*, 562 F.3d 1272, 1280–81 (10th Cir. 2009). It is the Court's view, however, that Magistrate Judge Furse's probable cause determination remains untouched. The issue in this case is not whether officers had probable cause to search Almost Home; rather, the issue is that Magistrate Judge Furse's authorization did not extend into Butler's residence. *Groh*, 540 U.S. at 561.

Judge Furse authorized officers to search Almost Home, not Butler's residence.  *Groh*, 540 U.S. at 561 ("The mere fact that the Magistrate issued a warrant does not necessarily establish that he agreed that the scope of the search should be as broad as the affiant's request.").

The focus of the EPA warrant was the portable toilet business on the property.  The EPA obtained evidence suggesting Almost Home was cutting corners and emptying their portable toilets into the Spanish Fork River.  The EPA had testimony from witnesses who had observed Butler dumping septic waste into the river.  Witnesses also observed piping or hoses leading from the business to the river, discolorations of the river, and debris such as toilet paper along the bank and downstream from the business.  (Gov't Ex. 1 at p. 3–5, ¶¶ 13, 21–23.)  Furthermore, the Provo Water Reclamation Facility informed investigators that Almost Home had slowed its normal permitted discharges to the facility.  (*Id.* at p. 4, ¶ 20.)  All of these facts lead to the reasonable inference that Almost Home was improperly discharging sewage in the Spanish Fork River.  Therefore, the warrant correctly sought to obtain piping, hosing, business records, and water, soil, and plant samples from the property.  There is nothing in the warrant to suggest that the EPA believed evidence of illegal dumping would be found in Butler's bedroom.  Moreover, even if the EPA could articulate some facts tying possible Clean Water Act violations to Butler's residence, the EPA failed to do so.

The government argues that officers had probable cause to search Butler's residence because of the exposed piping and bathrooms located in the residence.  The government contends, "officers were authorized to be in the residence by virtue of the fact that attachments A and B to the search warrant entitled them to search the pipes and drains of the premises at 1819 South Main Street in Spanish Fork, Utah."  (Dkt. No. 43, p. 5, n.2).  The Court finds the government's arguments unpersuasive.  Indeed, the government's theory of the case shifted to fit

their litigation position.  At the first oral argument on Butler's Motion, counsel for the government proffered that officers "did not believe that it would be fruitful" to continue to search Butler's bedroom for business documents, "because [officers] discovered that there was an office upstairs."  (Tr. 2 at 32:9–24.[10])  Furthermore, counsel argued that "[t]he probable cause was to search the business."  (*Id.*)  Once the officers realized they were in a residence, counsel offered that the officers did "not search the residence."  (*Id.*)  Now that there is evidence before the Court that Detective Robinson continued to look through the residence, the government wishes to argue that officers had authorization to be in the residence.  The Court disagrees.  The EPA warrant did not permit officers to search Butler's residence for violations of the Clean Water Act.[11]

### C. Application of the Good Faith Exception

Detective Robinson's presence in Butler's residence was not permitted by the EPA warrant and was unconstitutional.  Therefore, the Court must determine whether the evidence obtained in the residence is saved by the good faith exception to the warrant requirement.  The Government contends that the exposed piping and bathrooms located in the residence provided officers with an objectively reasonable belief that the EPA warrant authorized officers to be present in the residence.  (Tr. at 107:2–5.)

---

[10] Reference to the transcript of oral argument conducted on December 8, 2015 will be cited as "Tr. 2 at __."

[11] The Court recognizes that the officers in this case had authority to perform a protective sweep of Butler's residence despite the EPA warrant's lack of authorization.  *See Maryland v. Buie*, 494 U.S. 325, 327 (1990).  Butler was a known felon and officers believed he was likely to be in the residence during the execution of the warrant.  (Tr. at 74:12–13; 81:2–7.)  Therefore, officers had grounds to perform a protective sweep of the residence.  However, because the evidence Butler seeks to suppress was not found until the fourth entry of the bedroom, the government concedes it is not relying on a protective sweep theory to avoid suppression.  (Dkt. No. 43, p. 5 n.2 ("[T]he drugs that were found in plain view in Mr. Butler's bedroom . . . were not found during the initial protective sweep of the residence.").)

It is well established that the purpose of the exclusionary rule is to deter police misconduct and to provide incentives for the law enforcement profession to conduct itself in accord with the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 918–19 (1984). Therefore, "evidence obtained pursuant to a warrant that is later found to be defective is not properly excluded when the warrant is relied on by the officers in objective good faith." *United States v. Gonzales*, 399 F.3d 1225, 1229 (10th Cir. 2005). Application of the good faith exception is an objective inquiry—requiring the court to examine the facts and circumstances of the search to determine "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922, n.23. Importantly, the good faith exception assumes law enforcement has "a reasonable knowledge of what the law prohibits." *Id.*

When an officer acts pursuant to a warrant, good faith is presumed. *United States v. McKneely*, 6 F.3d 1447, 1455 (10th Cir. 1993). However, the good faith presumption is not without limits. An "officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence." *Id.* For example, "a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923. Similarly, "[f]or good faith to exist, there must be some factual basis connecting the place to be searched to the defendant or suspected criminal activity. When this connection is wholly absent, the affidavit and resulting warrant are 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Gonzales*, 399 F.3d at 1231 (citing *Leon*, 468 U.S. at 923).

In *United States v. Gonzales*, the defendant was suspected of being a felon in possession of a firearm. *Id.* at 1227. The defendant's vehicle was inventoried after being involved in a car accident. *Id.* During the inventory search, officers found ammunition but no matching weapon. *Id.* Officers applied for a warrant to search the defendant's residence for firearms and ammunition. *Id.* The warrant affidavit described the place to be searched as "321 E. Church"; however, the "affidavit never specified that 321 E. Church was [the defendant's] residence or that there was any other connection between that location and [the defendant], the vehicle, or the suspected criminal activity." *Id.* at 1227–28. The affidavit merely disclosed the officer's belief that based on his training and experience, firearms are often kept at residences and in vehicles. *Id.* at 1228. In evaluating the good faith exception, the court noted:

> [the officer's] affidavit listed the address of the place to be searched in the caption and described the residence with particularity; however, there were no facts explaining how the address was linked to [the defendant], the vehicle, or the suspected criminal activity, or why the officer thought the items to be seized would be located at the residence . . . The only attempt at a connection was the [the affiant's] assertion that in his experience, 'firearm [sic] are often kept at the residence'

*Id.* at 1230 (citations omitted). The court concluded that good faith "may exist when a minimal nexus between the place to be searched and the suspected criminal activity is established." *Id.* at 1231. However, the court held that the warrant and supporting affidavit failed to make any connection between the place to be searched, the defendant, and the suspected criminal activity. *Id.* The court determined "[e]xclusion is appropriate in such circumstances because 'reasonably well-trained' officers, exercising their own professional judgment, will be able to recognize the deficiency.'" *Id.*

Just like *Gonzalez*, the Court finds that a reasonably well-trained officer would have realized that the EPA warrant did not provide officers authorization to search Butler's residence.

The EPA warrant failed to disclose and particularly describe Butler's residence. Like *Gonzalez*, the EPA warrant did not provide even a "minimal nexus" between the Butler's residence and violations of the Clean Water Act. Furthermore, officers knew Butler maintained a residence on the lower level of the building. Once Detective Robinson and his fellow officers performed a protective sweep and determined the precise location of the residence, officers should have recognized a continued presence in the residence was outside the scope of the EPA warrant.

In short, Detective Robinson engaged in the exact type of activity the Fourth Amendment prohibits. Detective Robinson used what he should have known was a defective warrant to engage in a general search of Butler's home. Importantly, the Court is not demanding that a police officer understand the subtleties of constitutional law. The Court is merely requiring that if an officer wishes to search a residence, the officer properly request permission to do so.

## II. Application of the Exclusionary Rule and the Fruit of the Poisonous Tree Doctrine

Having determined that the EPA warrant failed to provide officers a legal basis to search Butler's residence and the good faith exception inapplicable, the Court must now determine what evidence is excludable. "Under the exclusionary rule, the government may not introduce into evidence 'tangible materials seized during an unlawful search [or] . . . testimony concerning knowledge acquired during an unlawful search.'" *United States v. Henderson*, 595 F.3d 1198, 1201 (10th Cir. 2010) (quoting *Murray v. United States*, 487 U.S. 533, 536 (1988)). Furthermore, "under the fruit of the poisonous tree doctrine, the exclusionary rule bars the admission of physical evidence and live testimony obtained directly or indirectly through the *exploitation* of unconstitutional police conduct." *United States v. Hatfield*, 333 F.3d 1189, 1193–94 (10th Cir. 2003) (emphasis added) (citations omitted). The government may avoid suppression under the fruit of the poisonous tree doctrine by demonstrating that "the evidence

would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Nava-Ramirez*, 210 F.3d at 1131.  The facts of this case and the constitutional issues involved are complicated. Therefore, the Court will examine each item of evidence to determine the force of the exclusionary rule.

### A. The Drugs and Drug Paraphernalia Viewed in Butler's Residence

The drugs and drug paraphernalia viewed in Butler's bedroom are inadmissible as direct fruits of a Fourth Amendment violation.  Detective Robinson testified he discovered numerous items of evidence in plain view during his search of the residence.  During Detective Robinson's fourth entry into the bedroom, Detective Robinson observed a pipe containing marijuana in plain view.  (Tr. at 69:23–25.)  While questioning Vert during his fifth entry into the bedroom, Detective Robinson observed in plain view a jar filled with a green leafy substance on top of the bedroom dresser, which based on his training and experience he recognized to be marijuana.  (Tr. at 71:21–22.)  Additionally, Detective Robinson observed in plain view in a partially open dresser drawer a digital scale, small bags, a bag with a white crystal substance that Detective Robinson recognized as methamphetamine, glass methamphetamine pipes, and a bag with a green leafy substance which Detective Robinson recognized to be marijuana.  (Tr. at 71:23–25; 72: 4–15 ("Q. Was that drawer partially open or did you have to open the drawer?  A. It was already partially opened.").)  Detective Robinson lacked a legal basis for being present in Butler's residence; therefore, the items observed in Butler's bedroom are in inadmissible.  *See Harman*, 446 F.3d at 1087 ("'Of course, if the police officers' presence in the home itself entailed a violation of the Fourth Amendment, no amount of probable cause to believe that an

item in plain view constitutes incriminating evidence will justify its seizure.'" (quoting *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 66 n.10 (1992)).

### B. The .22 Ammunition and .22 Rifle Located Outside the Residence

Detective Robinson was entitled to be in the business portion of the building; therefore, the .22 ammunition is admissible under the plain view doctrine. "The plain view doctrine authorizes seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior Fourth Amendment justification and who has probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas*, 463 U.S. 765, 771 (1983). For evidence to be admissible under a plain view theory the Court must ask whether: "(1) the officer was lawfully in a position from which to view the object seized in plain view; (2) the object's incriminating character was immediately apparent . . . ; and (3) the officer had a lawful right of access to the object itself." *United States v. Soussi*, 29 F.3d 565, 570 (10th Cir. 1994) (citations omitted).

First, Detective Robinson testified that he viewed the .22 ammunition without any manipulation or maneuvering. (*See* Tr. at 7:13–15; 65:14–20.) The ammunition was in plain sight on a shelf located near the entrance of the lower level of the building. (*Id.*) Second, Detective Robinson testified he was aware that Butler was a felon and was not permitted to possess firearms or ammunition. (Tr. at 74:12–13; 81:2–7.) Finally, the EPA warrant provided officers the authority to be present in the business portion of the building. Butler's counsel acknowledged that the hallway shared by the entrance to the residence and the shop area was part of the business. (Tr. at 95:16–25; 96:1–2.) Therefore, the Court finds that the .22 ammunition is admissible under the plain view doctrine.

Similarly, the Court finds that the .22 rifle is admissible because it was found independently of Detective Robinson's illegal search of Butler's residence.  The government may avoid suppression of evidence if the government can show that the evidence was obtained by means independent of the Fourth Amendment violation.  *See United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006).  Additionally, "[i]n executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search."  *L.A. Cnty v. Rettele*, 550 U.S. 609, 614 (2007).

Detective Robinson testified that after he observed the .22 ammunition, he questioned Butler about weapons on the property for officer safety.  (Tr. at 66:10–18.)  As a result of Detective Robinson's questioning, the .22 rifle was found outside the residence behind the open door to the kitchen.  The Court finds that Detective Robinson's questioning was a reasonable measure to ensure the safety of the officers on the property.  Furthermore, the Court finds that the .22 rifle was discovered independently of the illegal search of Butler's residence and therefore is admissible.

### C. Evidence Obtained Pursuant to the Second Warrant

Butler contends that the basis for the second warrant was solely the illegally obtained information in Butler's residence.  (Dkt. No. 28, p. 9.)  Therefore, Butler argues that the evidence obtained as a result of the invalid second warrant is suppressible under the fruit of the poisonous tree doctrine.  (*Id.*)  The Court disagrees.  A warrant that relies on unconstitutionally obtained information is not automatically invalid.  The Tenth Circuit has instructed that a tainted warrant should not be invalidated where probable cause exists, absent the unconstitutionally obtained information.  *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005) ("When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information."); *see also United States v. Martinez*, 696 F.

Supp. 2d 1216, 1244–45 (D.N.M. 2010) *aff'd*, 643 F.3d 1292 (10th Cir. 2011).  Indeed, "'[a]n affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.'"  *Sims*, 428 F.3d at 954 (quoting *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990)).

 The Court finds that the second warrant application contained sufficient untainted evidence to support a finding of probable cause.  The second warrant obtained by Special Agent Moore was based on several items of evidence that were not tainted by the illegal search of Butler's residence, including: (1) Butler's prior felony convictions and Butler's relationship to the residence; (2) Butler's post-Miranda statements regarding the location of the .22 rifle; (3) the .22 rifle ammunition; (4) the .22 rifle; and  (5) the gun safes observed by officers in the "shop area" of the lower level of the building.

 "Probable cause to issue a search warrant exists  . . . when the supporting affidavit sets forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *United States v. Basham*, 268 F.3d 1199, 1203 (10th Cir. 2001).  Butler's prior felony convictions, Butler's relationship to the business and residence, coupled with the ammunition and the firearm were sufficient to provide probable cause to search the business and residence for weapons and ammunition.  Therefore, the second warrant is valid and any evidence obtained as a result of the second warrant is admissible.

## CONCLUSION

For the reasons stated above, Butler's motion to suppress is GRANTED IN PART AND

DENIED IN PART.

Dated: February 22, 2016.

BY THE COURT:

_____

Dee Benson
United States District Judge